**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| THE SCOTTS COMPANY LLC AND THE HAWTHORNE GARDENING COMPANY,<br><br>     **Plaintiffs,**<br><br>     **v.**<br><br>JONAH PARKER,<br><br>     **Defendant.** | **Case No. 2:21-cv-00020**<br><br>**Jury Demand Endorsed Hereon** |

**COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, FEES, AND DAMAGES**

Plaintiffs The Scotts Company LLC and its affiliate The Hawthorne Gardening Company (together with any other applicable affiliates, "Scotts") for their Complaint against Defendant Jonah Parker ("Parker") state as follows:

**BACKGROUND**

1.      Scotts has employed Parker in several important positions at the company and its affiliates over the last nine years from approximately March 2011 to December 2020.  Parker recently informed Scotts, however, that he was planning to join a competitor in direct violation of his non-compete agreement with Scotts ("Agreement").  Over the last few months, Parker served as the Director of eCommerce for Omnichannel (handling accounts with Scotts' largest retail consumers) and Direct-to-Consumer ("DTC") business and also acquired the title of Director of Sales for Scotts.

2.      Despite agreeing not to compete with Scotts for two years after leaving the company, not to use Scotts' trade secrets and confidential information, and not to solicit customers away from Scotts,

1

Parker informed Scotts that he accepted a position with HydroFarm, a significant competitor of Scotts, as *Vice President of eCommerce* – essentially carrying out the same role that he served at Scotts. To its credit, HydroFarm (through its counsel) indicated that it took the matters raised by Scotts "seriously" and indicated that it would not be employing Parker at this time, but Parker himself continues to assert that he "didn't remember" signing the non-compete agreement, that the agreement has "multiple holes" in it, and that it should not be enforced against him.

3.       If Parker were permitted to join HydroFarm or another direct competitor in violation of the Agreement, he could use Scotts' trade secrets and confidential information to undermine Scotts' business interests and misappropriate those trade secrets and confidential information to Scotts' disadvantage. With Parker's extensive knowledge of Scotts' business and his expressed intent to leave the company to work for a direct competitor in the growing hydroponics industry, he has the ability to take Scotts' customers, undercut Scotts' pricing, trade on personal relationships with Scotts' customers (which Scotts paid him to cultivate), and undermine the very work that Scotts compensated him to perform for Scotts over the last nine years. If permitted, his use and disclosure of Scotts' confidential and commercially sensitive information would irreparably damage Scotts' operations, profit margins, and brand name.

4.       At bottom, this lawsuit simply seeks to require that Parker comply with the terms of his Agreement. Under the terms of that Agreement, Parker cannot compete with Scotts by engaging in the exact same type of work in a similar position as the one he held with Scotts and cannot use Scotts' trade secrets and confidential information to conduct business at a direct competitor or solicit Scotts' customers in violation of the terms of the Agreement. Scotts also seeks attorney's fees and other damages incurred as a proximate result of Parker's violation of the terms of the Agreement.

**THE PARTIES**

5.       The Scotts Company LLC is an Ohio limited liability company with its principal place of business in Marysville, Ohio. The Hawthorne Gardening Company ("Hawthorne") is a Delaware company

with its principle place of business in New York.  Both are subsidiaries of the Scotts Miracle-Gro Company ("SMG").

6.      Defendant Parker is an individual who currently resides in Kingwood, Texas.

## JURISDICTION AND VENUE

7.      Parker previously resided in the State of Ohio, has worked for companies in the state of Ohio, and, on information and belief, executed the Agreement at issue while employed in the state of Ohio and while residing in the State of Ohio.  Thus, personal jurisdiction exists over Parker.  In addition, personal jurisdiction is also proper because Parker consented to the jurisdiction of this Court by signing the Agreement that forms the basis of this action. Section 10 of that Agreement states:

> THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF OHIO IRRESPECTIVE OF CHOICE OF LAW PRINCIPLES. [Parker] and [Scotts] agree that any action brought by any party in connection with this Agreement shall be filed in either state or federal court located within the State of Ohio.

8.      This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. Scotts is an Ohio corporation with both its principal place of business and its place of incorporation in Ohio.  Hawthorne is a Delaware company with its principle place of business in New York.  Parker resides in Texas.  Thus, the parties satisfy any diversity requirements.  In addition, the amount in controversy exceeds $75,000, exclusive of interests and costs.  In addition, this Court has authority to adjudicate the claims under 28 U.S.C. § 2201 (the Declaratory Judgment Act) and Federal Rule of Civil Procedure 57.

9.      This Court is the proper venue pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred in Ohio and, in any event, venue is proper under applicable law.

## MATERIAL FACTS

10.     Over the past 150+ years, Scotts has evolved from a family general store to North America's leader in lawn and garden products.  In addition, Scotts sells many products in the hydroponics industry, which involves growing plants indoors or in other settings without soil.

11.     Scotts employed Parker from approximately March 2011 until December 2020.

12.     Parker started his tenure with Scotts in March 2011 as a District Market Manager in the Texas field office.  In 2014, Parker relocated to Scotts' Marysville Corporate Office—Scotts' principal place of business—where he served as the SWAT-Sales Director for Scotts.  In 2015, Parker acquired additional responsibilities and became the Director of Hawthorne Sales for Hawthorne operations.  In 2017, Parker moved to Colorado and acquired additional responsibilities as a Director of Retail Sales employed by Hawthorne.

13.     In 2018, Parker also acquired responsibilities for developing the AeroGarden brand line for another affiliate of Scotts.  Before the onset of Covid-19, Parker's position required frequent travel to Ohio for meetings at Scotts' Marysville corporate offices.  In 2020, at his request, Parker relocated to Texas and continued working on critical projects for Scotts and Hawthorne.

14.     In the latter half of 2020, Parker was the Director of eCommerce for Omnichannel & Direct-to-Customer and also acquired the title of Director of Sales for Scotts.  He was responsible for eCommerce for Scotts' main accounts, including its largest major brand name retailer.  In this position, Parker was responsible for expanding Scotts' and Hawthorne's customer base.  In his words, he led "efforts to grow and serve [Hawthorne] customers." *See* Ex. C.  His stated goal was to put "products in the hands of every consumer in the US by partnering with our great retail partners."  *Id.*  He noted that he was "responsible for *all omni-channel & direct brand sites* for Scotts Miracle Gro & The Hawthorne Gardening Company." *Id.* (emphasis added).  In his lead sales role, he also collaborated with "numerous distribution channels to meet the ever changing demands of a fast growing consumer segment." *Id.*

15.     Scotts and its affiliates sell many different hydroponic products in the hydroponics industry, including more traditional hydroponics products and "countertop" hydroponics products in the hydroponics business.  Parker has detailed knowledge regarding Scotts' confidential sales processes, methods, and plans regarding the sale, marketing, and distribution of commercial and retail sales of hydroponic products in the hydroponics industry.  Parker has familiarity with many aspects of Scotts' operations.  In the last couple of years, Parker also oversaw in-store and online retail sales for the AeroGarden product line, which included making pricing decisions, developing sales strategies, and analyzing business margins.

16.     In recent months prior to resigning from Scotts, Parker was working on multiple confidential sales initiatives for Scotts and Hawthorne, including implementing the impending launch of hundreds of different hydroponics products for one of Hawthorne's largest retailers.  Prior to his departure, Parker was responsible for virtually all aspects of the launch currently anticipated for early 2021. He has pervasive knowledge of commercially sensitive details of the launch's marketing plan, business "attack" plan, retailer relationships, and customer databases.  Parker analyzed highly confidential pricing and margin information for the launch and further developed vendor relationships with the retailer's personnel.

## THE AGREEMENT

17.     In connection with his expanded responsibilities, increased access to confidential information and trade secrets, and relocation to Scotts' headquarters in 2014, and as a condition of continued employment, Scotts and Parker entered into the Agreement dated December 2, 2014, containing specific confidentiality, noncompetition, and non-solicitation provisions.  On information and belief, Parker executed the Agreement while he lived and worked in Ohio.

18.     Section 5 of the Agreement (attached hereto as Exhibit A) is titled "Restrictive Covenants." It expressly provides that during his employment with Scotts and for a period of two years after his employment ends, Parker "shall not, directly or indirectly, for [his] own benefit or for the benefit of any person or entity other than [Scotts]":

5

a)      "engage in, or be employed by a person or entity that engages in, the business of providing services and/or products that are competitive with [Scotts'] business as that business is conducted or proposed to be conducted during [Parker's] employment"

b)      "solicit or induce, or attempt to solicit or induce, any customer or prospective customer of [Scotts] (i) to cease being, or not becoming a customer of [Scotts] or (ii) to divert any of the customer's business or prospective business from [Scotts]"

c)      "interfere with, disrupt, or attempt to interfere with or disrupt the relationship, contractual or otherwise, between [Scotts] and any of its customers, clients, suppliers, consultants, or employees"

d)      "deliberately engage in any action that will cause substantial harm to [Scotts], including, but not limited to, disparagement of [Scotts]"

19.      The covenant not to compete applies to "any competitive activities in any geographic area either in which [Scotts] is engaged in business activities or in which customers are located."  Parker further agreed "that the restrictions contained in this Section 5 are *reasonable* in scope, duration, and geographic territory, and necessary to protect [Scotts'] legitimate business interests."  *Id.* (emphasis added).  In this Section, Parker also waived his right to challenge the covenants based on their length of time or geographic radius.

20.      Section 2 of the Agreement is entitled "Confidentiality."  It prohibits Parker from any of the following:

[D]irectly or indirectly, disclos[ing] or reveal[ing] to any person, or use for [Parker's] own personal benefit or for the benefit of anyone other than [Scotts], any Confidential Information of any kind, nature, or description (whether or not acquired, learned, obtained, or developed by [Parker] alone or in conjugation with others) belonging to or concerning [Scotts], or any of its customers or clients or others with whom [Scotts] now or hereafter has a business relationship, except (a) with the prior written consent of [Scotts], or (b) in the course of the proper performance of [Parker's] duties as an employee of [Scotts].

21.     Section 1 of the Agreement defines "Confidential Information" as including, without limitation, "any and all financial, commercial, technical, engineering or other information in written, oral, visual, or electronic form concerning the business and affairs of [Scotts]."

22.     Section 13 of the Agreement is titled "Notification."  It expressly requires Parker to "notify any person or entity employing [Parker] or intending to employ [Parker] of the existence and provisions of this Agreement."

## PARKER'S BREACH OF THE AGREEMENT

23.     Parker tendered his resignation to Scotts on December 22, 2020 and informed Scotts that he was taking a position with Hydrofarm, a direct competitor of Scotts in the hydroponics business, as its Vice President of eCommerce.  *See* Exs. D–G.

24.     If otherwise permitted, Parker's role at Hydrofarm would be Vice President of eCommerce, and he would be the "head of" Hydrofarm's eCommerce efforts for the company.

25.     Hydrofarm is a hydroponics company that offers products in the very same categories and markets and to many of the same customers as the Hawthorne's and Scotts' brands.

26.     Third parties view Hydrofarm as a direct competitor of Scotts as reflected by the media coverage surrounding Hydrofarm's IPO (attached hereto as Exhibits D–G).  Scotts Miracle-Grow, for instance, is listed as a "major competitive" participant in reports discussing Hydrofarm. *See* Ex. E, at 5. The article compares Hydrofarm's valuation to "direct competitor Scotts Miracle-Gro." Ex. E, at 9. Furthermore, Bloomberg—while discussing the Hydrofarm IPO—noted that "Scotts Miracle-Gro's Hawthorne business has also boomed with a similar, competing business in hydroponics." Ex. F.

27.     Upon information and belief, as the reported head of eCommerce, Parker's position with Hydrofarm would involve developing new programs and marketing and selling products that are in direct competition with the products that he oversaw at Scotts.  In addition, with Hydrofarm's intended

expansion, Parker likely would be instrumental in developing or marketing new product lines for Hydrofarm that compete with Scotts.

28.     In connection with the varying roles Parker held with Scotts and Hawthorne, Parker gained in-depth knowledge of confidential and commercially sensitive information and Scotts' proprietary trade secrets.  Scotts seeks to protect the misuse and misappropriation of its confidential and commercially sensitive information if Parker were to acquire the role of eCommerce Vice President for Hydrofarm or another direct competitor in violation of the terms of the Agreement.

29.     On December 24, 2020, after learning of Parker's plans to work for a direct competitor, Scotts informed Parker in writing of his obligations under the Agreement.  A true and accurate copy of the letter is attached hereto as Exhibit B.  Scotts advised Parker that, if he ignored his obligations, Scotts would be "forced to ask a court to intervene and to hold [him] to the Agreement."

30.     Scotts asked Parker to respond to the letter by December 28, 2020 with his "written assurance that [he]: (1) understand[s] [his] obligations under the Agreement, (2) ha[s] complied with those obligations; and (3) will continue to comply with the terms of the Agreement."  To date, Parker has yet to provide any such assurance.  To the contrary, Parker has taken the position that he "didn't remember" signing the Agreement and that it should not be enforced against him.

31.     To its credit, on December 29, 2020, Hydrofarm (through counsel) informed Scotts that it took the matters raised by Scotts "seriously" and it did not intend to move forward with Parker's employment at this time, but Parker himself has repeatedly refused to agree to comply with his obligations under the Agreement.  If Parker were permitted to compete with Scotts at Hydrofarm or elsewhere in violation of the terms of the Agreement that he signed, Scotts will be irreparably harmed.

## COUNT I
### BREACH OF CONTRACT

32.     Scotts incorporates the allegations set forth in the paragraphs above as if fully restated here.

33.     Parker agreed to become a party to, and be bound by, the Agreement.

34.     The Agreement is a valid and enforceable contract.

35.     Scotts fully performed its obligations under the Agreement.

36.     The Agreement provides that for two years following termination of his employment with Scotts, Parker will not compete with Scotts in markets where Scotts is engaged in business.

37.     Parker materially breached Section 5 of this Agreement by accepting employment with a direct competitor and has threatened to continue breaching the Agreement.

38.     The Agreement provides that Parker will not utilize any of Scotts' confidential information for his benefit or the benefit of Scotts' competitors.

39.     Parker's obligation to refrain from using Scotts' confidential information survives the termination of his employment.

40.     There is continuing threatened harm that Parker will materially breach Section 2 of the Agreement by using Scotts' confidential information after the termination of his employment to the detriment of Scotts' legitimate business interests.

41.     Parker's material breach of the Agreement and continuing threatened breach of the Agreement would, if permitted, damage Scotts in an amount that exceeds $75,000 and that will be established at trial.

42.     Parker continues to threaten to breach the Agreement and Scotts will be irreparably harmed thereby unless this Court enjoins such activities.

43.     Scotts has no adequate remedy at law and is threatened with irreparable harm. As Section 6(a) of the Agreement provides:

> [Parker] agrees and acknowledges that [Parker]'s breach of any of the provisions of paragraphs 2 and 5 of this Agreement, will cause, in addition to any liquidated or quantifiable monetary damages, irreparable damages to [Scotts] for which monetary damages alone will not constitute an adequate remedy. Consequently, [Parker] agrees that [Scotts] shall be entitled as a matter of right (without being required to prove damages or furnish any bond or other security) to obtain a restraining order, an

injunction, an order of specific performance, or other equitable or
extraordinary relief from any court of competent jurisdiction restraining
any further breach of such provisions by [Parker] or requiring [Parker] to
perform [his] obligations hereunder.

## COUNT II
## MISAPPROPRIATION OF CONFIDENTIAL AND TRADE SECRET INFORMATION

44.      Scotts incorporates the allegations set forth in the paragraphs above as if fully restated here.

45.      The threatened misappropriation of trade secrets is a sufficient basis to grant injunctive relief.

46.      By virtue of nine years of employment with Scotts, and as a senior employee at Scotts, Parker gained intimate knowledge of Scotts' confidential and competitively sensitive information and proprietary trade secrets.

47.      Parker resigned from Scotts and announced his intention to work for a direct competitor as a Vice President of eCommerce -- essentially the same role he held at Scotts.

48.      With Parker's knowledge and expertise of Hawthorne's and Scotts' business, the threat of misappropriation is palpable.

49.      Scotts has taken reasonable steps to maintain the secrecy of its propriety information, including, without limitation, utilizing restrictive covenants and limiting employee access to confidential information. Such information derives independent economic value from the fact that it is not a matter of public knowledge nor is it readily available for proper acquisition.

50.      Such information provides Scotts with an advantage over its competitors and has contributed significantly to it becoming one of the leaders in its industry.

51.      The threatened misappropriation of trade secrets will irreparably harm Scotts.

52.      The threat of harm is a sufficient basis for this Court to enjoin such activities.

## **PRAYER FOR RELIEF**

WHEREFORE, Scotts requests that this Court enter judgment in its favor and order the following:

A.      Declare that the Agreement is a valid contract;

B.      Enter an injunction enjoining Parker from further breaches or attempted breaches of the Agreement;

C.      Require that Parker comply with the terms of his Agreement;

D.      Enter judgment for Scotts against Parker for any compensatory and related damages, including without limitation any costs and attorney's fees Scotts has incurred in connection with this action or otherwise recoverable under the Agreement; and

E.      Award such other and further relief as this Court deems just and proper.

January 5, 2021                                     Respectfully submitted,


*/s/ Jeffrey J. Jones*
Jeffrey J. Jones, Trial Attorney (0030059)
 jjjones@jonesday.com
Elizabeth L. Dicus (0081219)
 eldicus@jonesday.com
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, OH 43215-2673
Telephone: (614) 469-3939
Facsimile:  (614) 461-4198

Thomas R. Goots (0066010)
 trgoots@jonesday.com
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114-1190
Telephone: (216) 586-3939
Facsimile:  (216) 579-0212

*Attorneys for Plaintiffs*
*The Scotts Company LLC and*
*The Hawthorne Gardening Company*

11

JURY DEMAND

The Plaintiffs The Scotts Company LLC and the Hawthorne Gardening Company hereby demand a jury trial of the maximum number of jurors permitted by law on any claims for which a right to jury trial attaches.

January 5, 2021                                    Respectfully submitted,


                                                   */s/ Jeffrey J. Jones*
                                                   Jeffrey J. Jones, Trial Attorney
                                                   (0030059)
                                                    jjjones@jonesday.com
                                                   Elizabeth L. Dicus (0081219)
                                                    eldicus@jonesday.com
                                                   JONES DAY
                                                   325 John H. McConnell Blvd.,
                                                   Suite 600
                                                   Columbus, OH 43215-2673
                                                   Telephone: (614) 469-3939
                                                   Facsimile:  (614) 461-4198

                                                    *Attorneys for Plaintiffs*
                                                   *The Scotts Company LLC and*
                                                   *The Hawthorne Gardening Company*