# EXHIBIT A



### EMPLOYEE CONFIDENTIALITY, NONCOMPETITION, NONSOLICITATION AGREEMENT

This Employee Confidentiality, Noncompetition, Nonsolicitation Agreement ("Agreement"), is by and between The Scotts Company LLC, and all companies controlled by, controlling or under common control with the Scotts Company LLC (collectively, the "Company"), and the person designated on the signature page hereof as "Employee." This Agreement is effective as of the date signed by Employee below (the "Effective Date").

WHEREAS, the Company desires to employ (or to continue to employ) Employee, and Employee desires to be employed by (or to continue to be employed by) the Company, in a position with respect to which Employee will have access to certain confidential and proprietary information of the Company;

WHEREAS, the Company desires to have Employee participate (or continue to participate) and Employee has reviewed and desires to participate (or continue to participate) in The Scotts Company LLC Executive/Management Incentive Plan (the "Plan"); and;

WHEREAS, the Company believes, and Employee hereby acknowledges, that the confidential and proprietary information of the Company is extremely important to the success of the Company, and Employee understands and agrees that the Company is willing to provide Employee access or continued access to such information, subject to and in consideration of the agreements of Employee set forth herein regarding confidentiality, noncompetition, nonsolicitation and related matters;

NOW, THEREFORE, in consideration for employment or continued employment, participation in the Plan, access to or continued access to Confidential Information (defined below), training, compensation and benefits, as well as other good and valuable consideration provided by the Company to Employee, the receipt and sufficiency of which are hereby acknowledged, Employee freely enters this Agreement according to the following terms and conditions:

1. Confidential Information. As used in this Agreement the term "Confidential Information" shall mean any and all financial, commercial, technical, engineering or other information in written, oral, visual, or electronic form concerning the business and affairs of the Company including, without limitation, (i) information derived from reports, investigations, experiments, research and work in progress, (ii) methods of operation, (iii) market data, (iv) proprietary computer programs and codes, (v) drawings, designs, plans and proposals, (vi) marketing and sales programs, (vii) client and supplier lists and any other information about the Company's relationships with others, (viii) financial information and financial projections, (ix) network and system architecture, (x) all other concepts, ideas, materials and information prepared or performed for or by the Company and (xi) all information related to the business plan, strategies, business, products, purchases or sales of the Company or any of its suppliers and customers. The term "Confidential Information" does not include information that: (a) was or is made available to the public without restriction by the Company or by a third party who has the right to disclose such information; (b) was previously known to the Employee independent of the Company or, subject to the terms of Section 4 of this Agreement, independently developed or derived by Employee without the aid, application or use of any Confidential Information, as evidenced by corroborating, dated documentation; or (c) is disclosed to Employee on a non-confidential basis by a third party who has the right to disclose such information.

2. Confidentiality. Employee recognizes and acknowledges that the Confidential Information, as it may exist from time to time, is a valuable, special and unique asset of the Company. Employee further recognizes and acknowledges that access to and knowledge of the Confidential Information is essential to the performance of the Employee's duties as an employee of the Company. Accordingly, during Employee's employment with the Company, and for an indefinite period thereafter, Employee shall hold in strict confidence and shall not, directly or indirectly, disclose or reveal to any person, or use for Employee's own personal benefit or for the benefit of anyone other than the Company, any Confidential Information of any kind, nature or description (whether or not acquired, learned, obtained or developed by Employee alone or in conjunction with others) belonging to or concerning the Company, or any of its customers or clients or others with whom the Company now or hereafter has a business relationship, except (a) with the prior written consent of the Company, or (b) in the course of the proper performance of Employee's duties as an employee of the Company.  Upon the termination of Employee's employment with

the Company, or whenever requested by the Company, Employee shall immediately deliver to the Company all Confidential Information in Employee's possession or under Employee's control.

3. Company Property. Upon the termination of Employee's employment with the Company, or whenever requested by the Company, Employee shall immediately deliver to the Company all property in Employee's possession or under Employee's control belonging to the Company without limitation.

4. Employee Created Intellectual Property. Any and all inventions, ideas, improvements, discoveries, concepts, writings, processes, procedures, products, designs, formulae, specifications, samples, methods, know how or other things of value ("Intellectual Property") which Employee may make, conceive, discover or develop, either solely or jointly with any other person or persons, at any time during the term of this Agreement or during the term of any prior employment by the Company, whether during working hours or at any other time and whether at the request or upon the suggestion of the Company or otherwise, which relate to or are useful in connection with the business now or hereafter carried on by the Company, shall be the sole and exclusive property of the Company, and where applicable, all copyrightable works shall be considered "Works Made for Hire" under the U.S. Copyright Act, 17 USC § 101 et seq. Employee (a) agrees to promptly disclose all such Intellectual Property to the Company, (b) agrees to do everything necessary or advisable to vest absolute title thereto in the Company, (c) assigns, without further consideration, to the Company all right, title and interest in and to such Intellectual Property, free and clear of any claims, liens or reserved rights of the Employee, and (d) irrevocably relinquishes for the benefit of the Company and its assignees any moral rights in the Intellectual Property recognized by applicable law.

5. Restrictive Covenants. Employee agrees that during the Employee's employment with the Company and for a period of two (2) years thereafter, Employee shall not, directly or indirectly, for Employee's own benefit or for the benefit of any person or entity other than the Company:

(a) engage in, or be employed by a person or entity that engages in, the business of providing services and/or products that are competitive with the Company's business as that business is conducted or proposed to be conducted during the Employee's employment. This prohibition shall generally apply to any competitive activities in any geographic area either in which the Company is engaged in business activities or in which its customers are located as of the date that Employee's employment ends;

(b) in addition to the prohibition contained in paragraph 5(a), Employee shall not be employed, or provide consulting services or other assistance to the Companies listed in Appendix A (the "List"). The Company reserves the right to identify additional or alternate companies for inclusion on the List in the future. Employee may contact the Company from time to time to obtain an updated copy of the List and the Company will promptly provide such list;

(c) employ, solicit for employment, or advise or recommend to any other person ("person" meaning a natural person or legal entity) that such other person employ or solicit for employment, any current or past employee of the Company (where "past employee of the Company" means any person employed by the Company within one year of the solicitation or proposed employment);

(d) solicit or induce, or attempt to solicit or induce, any customer or prospective customer of the Company (i) to cease being, or not becoming, a customer of the Company or (ii) to divert any of the customer's business or prospective business from the Company;

(e) otherwise interfere with, disrupt, or attempt to interfere with or disrupt the relationship, contractual or otherwise, between the Company and any of its customers, clients, suppliers, consultants or employees; or

(f) deliberately engage in any action that will cause substantial harm to the Company, including, but not limited to, disparagement of the Company.

Employee agrees that the restrictions contained in this Section 5 are reasonable in scope, duration, and geographic territory, and necessary to protect the Company's legitimate business interests. The restrictive covenants set forth in this Paragraph 5 are subject to Paragraph 8 hereof and Employee hereby waives any and all right to attack the validity of such covenants on the grounds of the breadth of their geographic scope or the length of their term.

6.

Certain Remedies.

(a) Employee agrees and acknowledges that Employee's breach of any of the provisions of paragraphs 2 and 5 of this Agreement will cause, in addition to any liquidated or quantifiable monetary damage, irreparable damage to the Company for which monetary damages alone will not constitute an adequate remedy. Consequently, Employee agrees that the Company shall be entitled as a matter of right (without being required to prove damages or furnish any bond or other security) to obtain a restraining order, an injunction, an order of specific performance, or other equitable or extraordinary relief from any court of competent jurisdiction restraining any further breach of such provisions by Employee or requiring Employee to perform its obligations hereunder. Such right to equitable or extraordinary relief shall not be exclusive but shall be in addition to all other rights and remedies to which the Company may be entitled at law or in equity, including without limitation the right to recover monetary damages as set forth in paragraph 6(b) and for the breach of any of the provisions of this Agreement.

(b) The parties agree that the monetary value of any breach of paragraphs 2 or 5 would be difficult to calculate. As a result, the parties agree that in the event of a breach of paragraph 2 or 5, in addition to any additional monetary damages that may be proven, Employee shall give up any right Employee may have to any unpaid bonus under the Plan, and shall, upon the Company's demand, repay all payments Employee has received under the Plan within 3 years prior to the breach. Employee acknowledges that this is a reasonable basis for estimating damages from such breach and that these estimated damages are separate from the irreparable harm contemplated in subparagraph 6(a).

(c) In the event that the Company seeks court enforcement of any of the provisions of this Agreement, or is forced to respond to an action filed by Employee and related to this Agreement, and the Company is the substantially prevailing party, Employee shall pay the Company's reasonable attorney's fees and costs incurred in those efforts.

7. Term of this Agreement. Except as otherwise expressly provided in paragraph 5, this Agreement shall continue in effect and survive for an indefinite period notwithstanding the termination of Employee's employment with the Company for any reason.

8. NO EMPLOYMENT AGREEMENT. THIS AGREEMENT IS NOT, HOWEVER, AND SHALL NOT BE DEEMED TO BE, AN EMPLOYMENT AGREEMENT THAT OBLIGATES THE COMPANY TO EMPLOY EMPLOYEE, OR OBLIGATES EMPLOYEE TO CONTINUE IN THE COMPANY'S EMPLOYMENT, FOR ANY TERM WHATSOEVER. UNLESS THERE IS A SEPARATE, WRITTEN EMPLOYMENT CONTRACT BETWEEN EMPLOYEE AND THE COMPANY TO THE CONTRARY, EMPLOYEE IS AN "AT WILL" EMPLOYEE OF THE COMPANY AND THE CONTINUATION OF EMPLOYEE'S EMPLOYMENT BY THE COMPANY IS SUBJECT TO THE RIGHT OF THE COMPANY TO TERMINATE SUCH EMPLOYMENT AT ANY TIME, WITHOUT CAUSE.

9. Severability. If any provision of this Agreement is held to be unenforceable for any reason, that provision shall be severed and this Agreement shall remain in full force and effect in all other respects. If any provision of this Agreement, although unenforceable as written, may be made enforceable by limitation thereof, then such provision will be enforceable to the maximum extent permitted by applicable law.

10. APPLICABLE LAW. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF OHIO IRRESPECTIVE OF CHOICE OF LAW PRINCIPLES. Employee and the Company agree that any action brought by any party in connection with this Agreement shall be filed in either state or federal court located within the State of Ohio.

11. No Reliance. Employee represents and warrants to the Company that no promise or inducement for this Agreement has been made to Employee except as set forth herein; and this Agreement is executed by Employee freely and voluntarily, and without reliance upon any statement or representation by the Company, or any of the Company's attorneys, employees or agents except as expressly set forth herein.

12. Assignment. The Company may assign, in whole or in part, its rights and obligations under this Agreement. The rights of the Company shall enure to the benefit of, and the obligations of the Company shall be binding upon, the Company's successors and assigns. Employee shall not be entitled to assign any of Employee's rights or obligations under this Agreement.

13. Notification. Employee shall notify any person or entity employing Employee or intending to employ Employee of the existence and provisions of this Agreement. Employee agrees that the Company may also notify any person or entity employing Employee or intending to employ Employee of the existence and provisions of this Agreement.

14. Modification and Waiver. This Agreement shall not be modified unless such modification is in writing and signed by the EVP, Human Resources for the Company. Further, the parties agree that the Company's waiver of any provision of this Agreement shall not constitute a waiver of any other provision of this Agreement.

AGREED AND ACKNOWLEDGED:

EMPLOYEE:                               THE SCOTTS COMPANY

_____                 By: _____
Signature                                   Signature

_____                 Denise Stump, EVP Human Resources
Printed Name                            Printed Name

_____
Date



EMPLOYEE CONFIDENTIALITY, NONCOMPETITION, NONSOLICITATION AGREEMENT
APPENDIX A – LIST OF COMPETITORS

Below is a list of companies that the Company deems to be its major competitors. This list is not intended as an exclusive list of all of the Company's competitors and it is a company's activities and not its presence on this list that qualify it as a competitor of the Company. This list will be updated on an on-going basis and provided to Employee upon Employee's request.

United Industries (RayOVac)
Spectrum Brands
Bayer, AG
Central Garden & Pet
Tech Pac
Enforcer Products
Green Light Company
Lebanon Chemical Corp
Dow Agro Sciences Company
Uniroyal Chemical Corporation
Gulf Stream
Chisso-Asahi Fertilizer Co
Pursell Technologies
Sun Gro
Fafard, Inc.
TruGreen-Chemlawn, a division of Service Master
Compo GmbH
Kali & Salz
Norsk Hydro ASA
Haifa Chemicals Ltd
Kemira Oyj
Pennington Seed
Old Castle
Agrium
JR Peters
OHP
Ron Solder
Florikan
Kemira Oyj
Williams Sonoma, Inc. *
Restoration Hardware *
Crate & Barrel *
Frontgate *
Robb & Stuckey *
Unopiu *
Ikea *
Sinclair
Westland
Brun
Neudorff
Florissa

_____
* Including subsidiaries, controlled entities and owned brands.

# EXHIBIT B



*The Scotts Company LLC*

December 24, 2020

**VIA FEDEX, REGULAR MAIL, AND E-MAIL**

Mr. Jonah Parker
29 Island Green Ct.
Kingwood, TX 77339
jonahrparker@gmail.com

Re:   **Your Obligations Under Your Employee Confidentiality, Noncompetition, Nonsolicitation Agreement**

Dear Mr. Parker:

I am an attorney with The Scotts Company LLC ("Scotts").  As you know, Scotts is an affiliate of Hawthorne Hydroponics LLC dba The Hawthorne Gardening Company ("Hawthorne"), and both are subsidiaries of the ScottsMiracle-Gro Company ("SMG").   This letter addresses your resignation from your current position as Director, eCommerce Omnichannel & DTC, where you have been supporting AeroGrow and, more specifically, the AeroGarden brand.   It is my understanding that you resigned from your position with Scotts, and that Scotts and AeroGarden accepted your resignation as of yesterday, December 23, 2020, which was effectively your last day with the Company.  In conjunction with your resignation, you informed Scotts that you were planning to start a new job with Hydrofarm.   You are prohibited from going to work for Hydrofarm, a competitor of Scotts/Hawthorne.

It should be undisputed that SMG and Hydrofarm are competitors.  Like SMG (through Hawthorne, AeroGarden and AeroGrow), Hydrofarm is a hydroponics company.  Hydrofarm offers products in the same categories and markets to the same customers as Scotts.  Third parties view Scotts/Hawthorne and Hydrofarm as competitors, as reflected in news media coverage of Hydrofarm's recent IPO.

In 2014, you signed an Employee Confidentiality, Noncompetition, Nonsolicitation Agreement (the "Agreement"), a copy of which is enclosed.  The Agreement broadly protects Scotts "and all companies controlled by, controlling, or under common control with the Scotts Company LLC (collectively the "Company")."   In relevant part, the Agreement provides that both during your employment and <u>for the two (2) year period after</u> you are employed, you "shall not, directly or indirectly, for [your] own benefit or for the benefit of any person or entity other than the Company:

- work for a business that provides "services and/or products that are competitive with the Company's business"

- "interfere with, disrupt, or attempt to interfere with or disrupt the relationship…between the Company and any of its customers, clients, suppliers, consultants, or employees"

- "deliberately engage in any action that will cause substantial harm to the Company"

*See* Agreement ¶ 5. You agreed that these restrictions were "reasonable in scope, duration, and geographic territory, and necessary to protect the Company's legitimate business interest" and waived any right to contend otherwise in the future. *Id.* These provisions should not be overlooked. The Agreement is governed by Ohio law, and the Ohio Supreme Court has adopted a "reasonableness" standard for restrictive covenants: if a restriction is reasonable it will be enforced. *See Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975). Under the terms of the Agreement, you have agreed that it is reasonable and waived the right to say otherwise.

Your varying roles at Scotts and Hawthorne over the years bar you from taking on any sort of role at Hydrofarm, including any sales or e-commerce role. Your job titles and duties clearly are sales-related. In fact, your LinkedIn page expressly notes that you have a "Leading" role in expanding Hawthorne's customer base to include "every consumer in the US" and notes your roles with AeroGrow/AeroGarden. Elsewhere, you note that you are "Responsible for all omni-channel & direct brand sites" for both Scotts and Hawthorne and emphasize the breadth of your role in "partnering across numerous distribution channels to meet the ever changing demands of a fast growing consumer segment." Scotts believes that your efforts at Hydrofarm will be directed at sales to customers in this same "fast growing consumer segment."

Additionally, the Agreement obligates you to refrain from using or disclosing any of SMG's confidential information, including trade secrets, and to hold such information in strict confidence. *See* Agreement ¶¶ 1-2. Due to the nature of your role at Scotts/Hawthorne, you have had in-depth exposure to confidential and competitively sensitive information that is Scotts' property. Based on what you have communicated about your intended role at Hydrofarm, Scotts is extremely concerned that you may have disclosed confidential information to Hydrofarm as part of the hiring process and/or that you will use such confidential information to carry out your intended job functions at Hydrofarm. That would be unacceptable to Scotts, would violate the Agreement, and underscores why you and Scotts entered into a two year non-competition agreement before Scotts granted you access to confidential information key to Scotts, Hawthorne, and AeroGrow business operations.

The Agreement also prevents you from "solicit[ing] or induc[ing], or attempt[ing] to solicit or induce, any customer or prospective customer of [SMG] 9i0 to cease being, or not becoming, a customer of the Company or (ii) to divert any of the customer's business or prospective business from the Company." *Id.* Again, Scotts is concerned that your planned role with Hydrofarm would involve exactly this type of prohibited solicitation and diversion.

Finally, the Agreement requires that you "notify any person or entity…intending to employ [you] of the existence and provisions of this Agreement." *See* Agreement ¶ 13. It is unclear whether your job offer from Hydrofarm was obtained because Hydrofarm chose to ignore the fact that the Agreement prohibits you from accepting such employment, or because you violated the Agreement by declining to notify Hydrofarm of the Agreement. The Agreement authorizes Scotts to notify Hydrofarm of the Agreement, which we are doing by copy of this letter.

December 24, 2020

**Based on the nature of Hydrofarm's business and your clearly stated obligations under the Agreement, you cannot work for Hydrofarm for at least two (2) years after you cease to work for Scotts. Scotts demands that you confirm that you will abide by the terms of the Agreement and will not work for Hydrofarm.**

If you choose to ignore this letter and your obligations under the Agreement, and begin to work at Hydrofarm, Scotts will be forced to ask a court to intervene and to hold you to the Agreement. Scotts will seek a restraining order or injunction to prevent you from commencing or continuing any work at Hydrofarm. If you force Scotts to litigate and Scotts prevails in court, then under the Agreement you "shall pay the Company's reasonable attorney's fees and costs incurred[.]" *Id.* ¶ 6(c).

Under the terms of the Agreement, Ohio law applies and such a lawsuit would be brought in a state or federal court in Ohio. Further, the agreement provides that courts in Ohio are the <u>only</u> appropriate forum for any disputes connected with the Agreement. *Id.* ¶ 10. If you ignore this part of the Agreement, and if you or Hydrofarm initiate legal action in any other forum, then Scotts will seek dismissal or transfer of such action on the basis of the Agreement. Any such action would only increase the fees and costs that Scotts ultimately would ask a court to require you to pay.

**By no later than December 28, 2020, please provide to us your written assurance that you: (1) understand your obligations under the Agreement, (2) have complied with those obligations; and (3) will continue to comply with the terms of the Agreement.**

Scotts also expects that you will preserve any and all of its property, including laptop and phone, as well as any files, data, and other records, as we proceed. We expect you to return those items promptly, and will be in touch soon to facilitate the return.

If you do not respond in a timely and satisfactory manner, Scotts has retained outside counsel and will authorize that firm to take any legal action necessary to protect its interests. Of course, if you have questions or wish to discuss, we could make ourselves available to do so.

Sincerely,

Trey Pauley
Manager, Litigation
The Scotts Company LLC
937.707.9039
trey.pauley@scotts.com

# EXHIBIT C



Retry Premium Free



Connect

Message

# Jonah Parker · 3rd

Director of Sales / Rainmaker / Servant at The Hawthorne Gardening Company

Boulder, Colorado, United States · 500+ connections · Contact info



The Scotts Miracle-Gro Company



The University of Texas at Austin - The
Red McCombs School of Business

## About

High-energy & internally motivated servant leader with 17+ years of cross-functional experience in
business development, mergers & acquisitions, corporate strategy, P&L management, team
leadership & people development. A results-oriented executive with a strong background in both
large corporations as well as start-ups. A self-starter who was the founding sales leader of a team
who started a new division & grew it to $1.2B in sales in less than 6 years. Recognized
throughout life and career for servant leadership style that inspires people to achieve at levels they
never believed possible.



Messaging

## Activity

840 followers



Congrats Ross! Lookin good brother.

Jonah commented



Yeah buddy!! Congrats man. Well...

Jonah commented



Great post and I am sorry for your loss. Losing a d...

Jonah commented

See all activity

## Experience

**Director, E-Commerce**
The Scotts Miracle-Gro Company
Apr 2020 – Present · 9 mos
Marysville, Ohio, United States

Responsible for all omni-channel & direct brand sites for Scott's Miracle-Gro & The Hawthorne Gardening Company. As an organization, we have resourced and rapidly built an extremely experienced and proficient team to support the omni-channel future of retail. We are partnering across numerous distribution channels to meet the ever changing demands of a fast growing consumer segment.

**Founding Member & Director of Sales**
The Hawthorne Gardening Company · Full-time
Oct 2014 – Present · 6 yrs 3 mos
Boulder, CO

Leading our efforts to grow and serve our customers. My goal is to put our phenomenal products in the hands of every consumer in the US by partnering with our great retail partners.

Currently I am working with our team at AeroGrow to shepherd our sales efforts of AeroGarden.

### District Market Manager - Sales



The Scotts Miracle-Gro Company
Apr 2011 – Sep 2014
· 3 yrs 6 mos
Austin, Texas Area

• Led a team of 8 Sales Managers & responsible for a $95M business covering the state of Texas
• Rebuilt entire team upon arrival after a massive ethics issue & implemented business processes that drive consistency and efficiency
• Achieved high employee morale and fed the organization with talent as 4 direct reports were been promoted to larger roles within the organization
• Led the business planning process for all district managers in the company
• District Market Manager of the Year, North America Sales Award, 2012

see less

### Frito Lay

7 yrs 11 mos

Lean Six Sigma Leader
Jan 2010 – Apr 2011
· 1 yr 4 mos

Zone Business Manager
Mar 2008 – Jan 2010
· 1 yr 11 mos

Show 1 more role

---

## Education

The University of Texas at Austin - The Red McCombs School of Business
Bachelor of Business Administration, Marketing
2000 – 2003

Texas A&M University
Texas Agriculture Lifetime Leadership

(1) Jonah Parker | LinkedIn

2014 – 2016

The Texas Agricultural Lifetime Leadership (TALL) program is dedicated in building future Texas leaders so that our food and fiber system is preserved and enhanced. Given the critical issues facing agriculture today, this selective 26 month certified program provides intensive leadership development experiences for a promising new generation of leaders.

The TALL Program enables men and women from all aspects of the agricultural community to:

Increase knowledge and understanding of agriculture and related industries in the context of today's complex economic, political and social systems
Learn the processes of organizational decision making and the role of political institutions
Acquire a greater appreciation of how agriculture must interact with society as a whole
Develop skills necessary for leadership at local, state and national levels and to put those skills into practice

# EXHIBIT D

 zoominfo



# Hydrofarm

## Description

Hydrofarm, headquartered in Petaluma, California, is a company that manufactures garden equipment including specialty lighting, hydroponics, and climate control... **Read More**



Phone:

(707) 765-9990



Website:

www.hydrofarm.com



Employees:

209



Revenue:

$235 Million



Stock Symbol:

HYFM

Update Company

View contact profiles from Hydrofarm

SIC Code 51,50
NAICS Code 44422,48
Ticker NASDAQ: HYFM
Show More

Popular Searches:

HydroFarm

Hydrofarm LLC

Hydrofarm Inc

Hydrofarm Holdings Group , Inc.

Hydrofarm , Inc.

Home Improvement & Hardware Retail

Retail

## Top Competitors of Hydrofarm



**1**

HydroGarden

71

**2**

Hawthorne Gardening

500

**3**

American Hydroponics

149

**4**

Indoor Gardens

# EXHIBIT E



Search



Hydrofarm Holdings Group (HYFM) intends to raise $130 million from the sale of its common stock in an IPO, according to an amended registration statement.

Petaluma, California-based Hydrofarm was founded to design, manufacture, and distribute controlled environment agriculture products, also known as

vertical farming, primarily in the United States and Canada.

Management is headed by Chairman and CEO Bill Toler, who has been with the firm since 2019 and was previously CEO of Hostess Brands (TWNK) and has more than 35 years experience in the supply chain management and CPG business.

Below is a brief overview video of a high-tech vertical farming operation:

Source: Bloomberg Quicktake

The company's primary offerings include:

- Lighting

- Equipment

- Grow Media

- Nutrients

- Supplies

The graphic below shows examples of the above categories:



Hydrofarm has received at least $182 million from investors

The company markets its products primarily through its eCommerce marketplace.

Hydrofarm sells more than 80% of its products to specialty hydroponic retailers, with the remaining sales through a smattering of gardening equipment and supply locations such as garden centers, hardware stores, commercial greenhouse builders and commercial resellers

Selling, G&A expenses as a percentage of total revenue have been dropping as revenues have increased.

The Selling, G&A efficiency rate, defined as how many dollars of additional new revenue are generated by each dollar of Selling, G&A spend, quadrupled to 2.0x in the most recent reporting period.

According to a 2018 market research report by Grand View Research, the global market for vertical farming was an estimated $2.5 billion in 2018 and is expected to reach $9.7 billion by 2025.

This represents a forecast very strong CAGR of 21.3% from 2019 to 2025.

The main drivers for this expected growth are a growing adoption by consumers of fruits and vegetables that are produced in an environmentally friendly manner as well as the strong growth of population in large urban centers.

Also, indoor farming can produce crops throughout the year, protecting crops from extreme weather.

Below is a chart showing the historical and projected future growth rate of various aspects of the vertical farming market in Canada:



Major competitive or other industry participants include:

- Scotts Miracle-Gro (SMG)

- National wholesale distributors

- Small regional competitors

Hydrofarm's recent financial results can be summarized as follows:

- Growing topline revenue, at an accelerating rate

- Increasing gross profit and gross margin

- A swing to operating profit and net income

- Uneven cash used in operations

Below are relevant financial results derived from the firm's registration statement:

| | Nine months ended September 30, | | Years ended December 31, | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | 2019 | 2018 |
| | (In thousands, except per share amounts) | | | |
| **Income statement data for period ended:** | | | | |
| Net sales | $254,763 | $181,338 | $235,111 | $211,813 |
| Gross profit | 47,624 | 21,576 | 27,086 | 24,070 |
| Selling, general and administrative | 37,084 | 30,759 | 43,784 | 42,229 |
| Impairment, restructuring and other[a] | 276 | 3,589 | 10,035 | 7,169 |
| Income (loss) from operations | 10,264 | (12,772) | (26,733) | (25,328) |
| Interest expense | 7,858 | 9,789 | 13,467 | 11,606 |
| Net income (loss)[b] | 2,125 | (22,372) | (40,083) | (32,892) |
| Net income (loss) attributable to common stockholders[b] | 135 | (22,372) | (40,083) | (32,892) |
| Net income (loss) per share attributable to common stockholders – diluted[c] | $ 0.00 | $ (0.32) | $ (0.57) | $ (0.69) |
| Net income (loss) per common share attributable to common stockholders on pro forma basis – diluted[d] | [ ] | n/a | [ ] | n/a |
| **Cash flows (used in) provided by:** | | | | |
| Operating activities | $ (7,777) | $ (11,520) | $ (13,302) | $ 4,437 |
| Investing activities | 1,328 | (3,572) | (3,818) | (3,312) |
| Financing activities | 6,408 | 4,663 | 19,900 | 25,516 |
| Net (decrease) increase in cash, cash equivalents and restricted cash | (2) | (8,082) | 4,934 | 25,717 |
| **Other data:** | | | | |
| Adjusted EBITDA[e] | $ 16,120 | $ (3,812) | $ (9,495) | $ (7,249) |
| Adjusted EBITDA as a percent of net sales[e] | 6.3% | -2.1% | -4.0% | -3.4% |
| Gross profit margin (gross profit as % of net sales) | 18.7% | 11.9% | 11.5% | 11.4% |
| Capital expenditures[f] | 700 | 541 | 768 | 1,343 |
| Federal net operating loss carryforwards | n/a | n/a | 58,000 | 35,000 |

Source: Company registration statement

As of September 30, 2020, Hydrofarm had $32.9 million in cash and $181.3 million in total liabilities.

Free cash flow during the twelve months ended September 30, 2020, was negative ($10.5 million).

HYFM intends to sell 8.67 million shares of common stock at a proposed midpoint price of $15.00 per share for gross proceeds of approximately $130 million, not including the sale of customary underwriter options.

Investors and company insiders have indicated an intent to purchase up to $30 million of the IPO at the IPO price. This is a significant vote of confidence in the firm and its ultimate valuation at IPO.

Assuming a successful IPO at the midpoint of the proposed price range, the company's enterprise value at IPO would approximate $582.4 million.

Excluding effects of underwriter options and private placement shares or restricted stock, if any, the float to outstanding shares ratio will be approximately 27.32%.

Per the firm's most recent regulatory filing, the firm plans to use the net proceeds as follows:

> The principal purposes of this offering are to repay existing indebtedness, for acquisitions, for working capital and other general corporate purposes, which may include the hiring of additional personnel and capital expenditures, to establish a public market for our common stock and to facilitate our future access to the public capital markets.

Management's presentation of the company roadshow is not available.

Listed underwriters of the IPO are J.P. Morgan, Stifel, Deutsche Bank Securities, Truist Securities, and William Blair.

## Commentary

HYFM is looking for public capital to pay down its debt and fund its expansion initiatives, which feature targeting the cannabis agriculture industry.

The company is headed by a veteran executive of major CPG and supply chain firms.

Hydrofarm's financials show impressive topline revenue and gross profit growth, at an accelerating rate of growth and a turn to slightly positive earnings, likely part of a 'window dressing' approach to the IPO.

Selling, G&A expenses as a percentage of total revenue have been dropping; its Selling, G&A efficiency rate has quadrupled to 2.0x.

The market opportunity for selling vertical/hydroponic farming products in North America is expected to expand at a substantial rate over the coming years, so presents the company with a positive industry backdrop for its growth trajectory.

J.P. Morgan is the lead left underwriter and IPOs led by the firm over the last 12-month period have generated an average return of 87.7% since their IPO. This is a top-tier performance for all major underwriters during the period.

As to valuation, compared to direct competitor Scotts Miracle-Gro, HYFM is seeking a generally lower valuation multiple while producing a higher growth rate, albeit on a significantly lower topline revenue base.

Given the firm's accelerating topline revenue and gross profit growth rates, reasonable IPO valuation and positive industry outlook, my opinion on the IPO is a BUY at up to $15.00 per share.



Expected IPO Pricing Date: December 9, 2020.

Glossary Of Terms

*(I have no position in any stocks mentioned as of the article date, no plans to initiate any positions within the next 48 hours, and no business relationship with any company whose stock is mentioned in this article. IPO stocks can be very volatile in the days immediately after an IPO. Information provided is for educational purposes only, may be in error, incomplete or out of date, and does not constitute financial, legal, or investment advice. Past performance is no guarantee of future results.)*

# EXHIBIT F

Bloomberg the Company & its Products  |  The Quint

| Markets | Business | BQ Blue Exclusive | Videos | Research Reports |

SUBSCRIBE    LOGIN

**In Hydrofarm IPO, Investors Seek Pot Growth Without the Pot**

Tiffany Kary

Bookmark

Published on December 10 2020, 10:59 PM
Last Updated on December 11 2020, 1:37 AM

(Bloomberg) -- Hydrofarm Holdings Group Inc.'s initial public offering topped the company's own pricing expectations, showing just how much investors want a piece of the cannabis action -- but without the actual cannabis.

Trading on Thursday started at $46 a share, well above the $20 price set in Wednesday's offering.

The maker of hydroponics equipment has benefited from growth in the marijuana market, which accounts for as much as 70% of Hydrofarm's end users, according to Chief Executive Officer Bill Toler. And since the 43-year-old company doesn't actually "touch the plant" -- investor-speak for businesses that keep a distance from the marijuana itself, thus avoiding legal concerns -- Hydrofarm has drawn interest even from large institutional backers.

"The marijuana stigma has gone the other way -- there's more interest," Toler, the former CEO of munchies-maker Hostess Brands Inc., said in an interview. Hydrofarm offers investors a "picks and shovels play" that isn't tied to the success of any one cannabis brand or retailer, he added.

The public debut comes just weeks after five more U.S. states voted to legalize cannabis and only a few days after the House of Representatives passed legislation to legalize marijuana at the federal level. While the latter bill isn't expected to pass the Senate, an incoming Democratic presidential administration has lifted hopes in the industry that U.S. legalization isn't far off.

That enthusiasm buoyed Hydrofarm, which surpassed expectations in its initial pricing. The company raised about $173 million in proceeds from Wednesday's offering, after saying earlier that it expected as much as $159.3 million and an initial price of $17.50 a share. Funds raised will be used to build brands, with potential acquisitions in nutrients and grow media, Toler said.

Unlike many cannabis companies, which have gone public in Canada or through maneuvers such as reverse takeovers, Hydrofarm's offering looked like a mainstream IPO, and it counted JPMorgan Chase & Co. and Stifel Financial Corp. as leading book-running managers.

**Federal Prohibition**

While institutional investors have shied away from cannabis due to ambiguous rules and federal prohibitions on loans and banking, ancillary plays have caught their attention. For instance, large firms hold more than half the shares of hydroponics retailer GrowGeneration Corp., according to Bloomberg data, while institutional investors account for less than 1% of Curaleaf Holdings Inc., the biggest multistate operator in the U.S.

GrowGeneration's stock has soared this year, making it a top cannabis stock of 2020. Scotts Miracle-Gro's Hawthorne business has also boomed with a similar, competing business in hydroponics.

With the cannabis industry maturing rapidly, Toler said there's potential for his company to serve customers from small, craft growers to massive greenhouses. "It's like the beer business," he said. "You have Miller and Anheuser-Busch at the top, but you also have 1,000s of craft beers. We think you're going to have that kind of a structure here."

©2020 Bloomberg L.P.

*Bloomberg*

Missing BloombergQuint's WhatsApp service? Join our **Telegram channel** or activate **Website Notifications.**

Stay Updated With **OnWeb News** On BloombergQuint

Recommended for you

# EXHIBIT G

Are These Cannabis Stocks The Best Marijuana Stocks To Invest In For 2021?

Case: 2:21-cv-00020-SDM-KAJ Doc #: 1-1 Filed: 01/05/21 Page: 32 of 38 PAGEID #: 44



QUICK LINKS : Goldman Sachs Conviction Buy List    Warren Buffett News    Elliott Associates News    Follow @Street_Insider

MarijuanaStocks.com, Press Releases

# Are These Cannabis Stocks The Best Marijuana Stocks To Invest In For 2021?

December 21, 2020 8:40 AM EST

*Get inside Wall Street with **StreetInsider Premium**. Claim your 1-week free trial here.*

Paid press release content from MarijuanaStocks.com. The StreetInsider.com news staff was not involved in its creation.

### Top Performing U.S. Cannabis Companies

The best marijuana stocks to invest in for 2020 might actually be a surprise to some investors watching cannabis stocks. In the past year pot stocks on your December 2020 watchlist have been delivering gains for shareholders since the March crash. In fact, the American cannabis industry is going into 2021 with strong revenue growth and more expansion opportunities in states that are establishing legalization. Currently, there are 9 MSOs with market caps above $1 billion and more IPOs coming in 2021. Along with a surge of newly public companies is also the increasing mergers and acquisitions that are taking place this year and into 2021. In many cases, companies like TerrAscend Corp. (TRSSF Stock Report) and Trulieve Cannabis Corp. (TCNNF Stock Report) are entering the state by way of these M&As as a fast way to establish their presence in emerging markets.

[Read More]

- The Best Marijuana Stocks To Watch For Next Week
- Are These The Best Marijuana Stocks To Invest In For 2021?

### MSOs Vs Ancillary Marijuana Stocks To Buy

Although in many cases these MSOs have seen substantial gains in the market this year, there is another area that is performing well for investors. In general, ancillary marijuana stocks are companies that offer services to the cannabis industry but are not directly related to touching the cannabis plant. Currently, this type of cannabis company has seen substantial gains this year and, in most cases, more gains than some leading MSOs in the U.S.

In fact, the cannabis industry REIT Innovative Industrial Properties Inc. (IIPR Stock Report) is up over 147% year-to-date and is starting Christmas week looking to add to that number. Another important point is that this sector in the cannabis market is known for displaying less volatility than the vertically integrated companies. So, this could make these stocks a better candidate for long-term investing in marijuana stocks. For the purpose of finding the best performing cannabis companies in the stock market let's look at marijuana stocks to watch going into 2021.

### Marijuana Stocks To Watch #1: GrowGeneration Corp.

GrowGeneration Corp. (GRWG Stock Report) is on the list of the best performing marijuana stocks in 2020. Generally, GrowGen owns and operates specialty retail hydroponic and organic gardening stores and currently has 39 stores nationwide. In detail, the company carries and sells thousands of products like organic plant nutrients, lighting technology, and hydroponic equipment used by commercial and home growers. In its most recent 2020 3rd quarter reporting the company saw record revenue of $55 million and is increasing its full-year guidance to $185-$190 million. Additionally, GrowGen continues to expand adding more retail locations to its business by means of

StreetInsider.com Top Tickers, 12/28/2020

1. KNTE          6. NNDM
2. APRE          7. CARR
3. MYOV          8. TVE:CN
4. PFE           9. NVAX
5. BABA          10. MARA

Are These Cannabis Stocks The Best Marijuana Stocks To Invest In For 2021?

Case: 2:21-cv-00020-SDM-KAJ   Doc #: 1-1   Filed: 01/05/21   Page: 33 of 38   PAGEID #: 45

recent acquisitions. By 2021 look for GrowGen to continue its rapid expansion plans and increase



its presence further in the U.S.

GRWG Stock is up over 842% year-to-date and continues to climb in the market. In fact, this is one of the best performing marijuana stocks in any category. Currently, the stock has blown through any price forecast analysts have predicted. And if the market continues to climb GRWG stock could reach a new 52-week high this week in the market. Because GrowGen continues performing well and is positioned for growth alongside the cannabis industry, it's on this watchlist. With this in mind, GRWG stock is one of the best marijuana stocks to invest in for 2020.

**Marijuana Stocks To Watch #2: The Scotts Miracle-Gro Company**

The Scotts Miracle-Gro Company (SMG Stock Report) is the world's leading marketer of branded consumer lawn and garden as well as indoor and hydroponic growing products. Scott's is considered a cannabis stock due to its wholly-owned subsidiary Hawthorne Gardening. Generally, Hawthorne is one of the largest suppliers of hydroponic products in North America. Recently Hawthorne has become an important component to Scott's balance sheet continuously delivering strong revenue growth. In fact, Hawthorne's sales are showing an increase of 68% in Q4 versus Q3 and up 61% year over year. Additionally, Scott's U.S. consumer segment sales show an increase of 90% quarter over quarter. This is up 24% from fiscal 2020. In total company-wide sales show an increase of 79% to $890.3 million. In this number, Hawthorne contributed $351.9 million for the



period.

SMG Stock is up over 94% year-to-date and is showing more potential going into the holiday week. Currently SMG stock gives an annual dividend of $2.48 a share a rare find for cannabis investments. Due to the fact that Scott's is a well-known consumer gardening product this increases the potential growth of the investment. At the present time, SMG stock has a price forecast of $212 an almost 6% increase from current price levels. Because SMG stock continues to perform well in December it is a pot stock to add to your 2021 watchlist.

**Marijuana Stocks To Watch #3: Hydrofarm Holdings Group, Inc.**

Hydrofarm Holdings Group, Inc. (HYFM Stock Report) is a new company on the block as far as IPOs are concerned but not necessarily new to the hydroponic industry. In fact, the company has over 40 years under its belt in the private sector. Hydrofarm's is a leading independent branded hydroponics company with comprehensive distribution and manufacturing in hydroponics equipment and supplies for controlled environment agriculture. Currently, the company works with major companies in the space like GrowGen which carries its products in its stores. With a successful model in the private sector, Hydrofarm can now raise capital to further continue



expanding its business.

HYFM Stock jumped up 160% on its initial day of trading and ended last week at $54.15. In general, HYFM stock has gained rapid notoriety and could be another great option in the ancillary

Most Read      Special Reports

- Wall St set to open near record highs after Trump signs fiscal aid bill
- Alibaba (BABA) Set to Gap Lower as Chinese Regulators Increase Pressure Despite Raised Buyback
- After Trump backs down on stimulus bill, Democrats aim for higher relief checks
- Latest Factory Checks Show Q4 Will Be 'Game Changer' for Tesla (TSLA) - Chowdhry
- UK Could Approve AstraZeneca (AZN) COVID-19 Vaccine as Early as Tuesday

# EXHIBIT H

**UPGRADE**

## Overview
## Competitors
## Acquisitions
## Funding
## News & Insights

**HYDROFARM**

[Hydrofarm's website →](#)

Hydrofarm manufactures and supplies indoor gardening and hydroponics products such as light reflectors, ballasts, lightening kits and bulbs. Read more

**View Employees**

128 Followers on Owler

**Following**

Chairman & CEO

## William D. Toler

CEO Approval Rating

89/100

**Weigh In**

| | |
|---|---|
| Founded: | 1977 |
| Status: | Public, Independent Company, NASDAQ, HYFM |
| SIC Code: | 100 NAICS listing » |

Annual Revenue

$235.1M

212

Sector

Agricultural Products

Headquarters

Petaluma

,

California

San Francisco Bay Area

## TOP COMPETITORS OR ALTERNATIVES

| RANK | COMPANY | CEO | CEO RATING | EMPLOYEES | FUNDING | REVENUE |
|------|---------|-----|------------|-----------|---------|---------|





William D. Toler
Chairman & CEO

89/100

212

$264.7M



$235.1M

1

Jim Hagedorn
Chairman & CEO

100/100

5,600

$25M

$4.1B

Follow

2

Jeff Bisberg
CEO

81/100

100

$100.9M

$20M

Case: 2:21-cv-00020-SDM-KAJ Doc #: 1-1 Filed: 01/05/21 Page: 38 of 38  PAGEID #: 50



**Follow**

3

CEO

- -

40

$5.6M

$7M

**Follow**

4

Ethan Holmes
President

90/100

22

- -

$6M

**Follow**

5